# IN THE SUPREME COURT OF CALIFORNIA

FILMON.COM INC.,
Plaintiff and Appellant,

v.

DOUBLEVERIFY INC.,
Defendant and Respondent.

S244157

Second Appellate District, Division Three
B264074

Los Angeles County Superior Court
BC561987

May 6, 2019

Justice Cuéllar authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Kruger, and Groban concurred.

FILMON.COM INC. v. DOUBLEVERIFY INC.

S244157

Opinion of the Court by Cuéllar, J.

The Legislature enacted Code of Civil Procedure section 425.16 to address so-called strategic lawsuits against public participation (SLAPP). (Code Civ. Proc., § 425.16 [the anti-SLAPP statute].)[1] This anti-SLAPP statute makes available a special motion to strike meritless claims early in litigation — but only if the claims arise from acts in furtherance of a person's "right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b).) In a catchall provision relevant to this case, the statute specifies that such acts include "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) But nowhere does the statute further define these terms.

FilmOn.com Inc. (FilmOn) is a for-profit business entity that distributes web-based entertainment programming. In this case, FilmOn sued DoubleVerify Inc. (DoubleVerify), another for-profit business entity that offers online tracking, verification and "brand safety" services to Internet advertisers. FilmOn alleged that DoubleVerify disparaged its digital distribution network in confidential reports to DoubleVerify's paying clients. DoubleVerify responded by filing an anti-SLAPP motion to strike.

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

1

We granted review to decide whether the commercial nature of a defendant's speech is relevant in determining whether that speech merits protection under the catchall provision. To resolve this question, we also clarify how the context of a statement more broadly — including the identity of the speaker, the audience, and the purpose of the speech — informs the same analysis.

What we hold is that the context of a defendant's statement is relevant, though not dispositive, in analyzing whether the statement was made "in furtherance of" free speech "in connection with" a public issue. (§ 425.16, subd. (e)(4).) In an age of easy public access to previously private information through social media and other means, context allows us to assess the functional relationship between a statement and the issue of public interest on which it touches — deciding, in the process, whether it merits protection under a statute designed to "encourage continued participation in matters of public significance." (§ 425.16, subd. (a).)

In giving effect to this statutory purpose, we find that DoubleVerify's reports — generated for profit, exchanged confidentially, without being part of any attempt to participate in a larger public discussion — do not qualify for anti-SLAPP protection under the catchall provision, even where the topic discussed is, broadly speaking, one of public interest. This is not because confidential statements made to serve business interests are categorically excluded from anti-SLAPP protection. It is instead because DoubleVerify's reports are too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public conversation about those issues, to merit protection under the catchall provision.

Because the Court of Appeal found DoubleVerify's reports protected under the anti-SLAPP statute, and held that context is irrelevant to the anti-SLAPP analysis under subdivision (e)(4), we reverse.

## I.

Internet use has become pervasive in less than a generation, and along with it, advertising through online platforms. (See Interactive Advertising Bureau, *IAB Internet Advertising Revenue Report* (May 2018) <https://www.iab.com/wp-content/uploads/2018/05/IAB-2017-Full-Year-Internet-Advertising-Revenue-Report.REV2_.pdf> [as of May 2, 2019].)[2] To ensure their advertising dollars are wisely spent and the ads are placed on sites with content appropriate for their target customers, businesses monitor the websites on which they advertise or may wish to advertise. One company offering such monitoring services — which include collecting and packaging information about a website's content, viewers, and advertising practices — is defendant DoubleVerify.

For its large stable of clients, DoubleVerify gathers and provides information about the websites on which the clients are interested in advertising. The businesses pay for the reports and agree to keep them confidential. In return, they receive from DoubleVerify information on the location of the website's viewers, whether a competitor advertises on the website, where the website displays advertisements, how long the advertisements are shown, and — crucial to this litigation — a description of the website's content. Such a description comes

---

[2] All Internet citations in this opinion are archived by year, docket number, and case name at http://www.courts.ca.gov/38324.htm.

in the form of a "tag" or "label classifying the website's content." (*FilmOn.com v. DoubleVerify, Inc.* (2017) 13 Cal.App.5th 707, 712 (*FilmOn*).) For instance, DoubleVerify may tag a website as containing "Adult Content," which it then defines, in a glossary included in the report, as " ' "[m]ature topics which are inappropriate viewing for children including explicit language, content, sounds and themes." ' " (*Ibid.*) Similarly, DoubleVerify also has a "Copyright Infringement: Streaming or File Sharing" tag, defined as " ' "Sites, presently or historically, associated with access to or distribution of copyrighted material without appropriate controls, licensing, or permission; including but not limited to, sites electronically streaming or allowing user file sharing of such material." ' " (*Ibid.*)

Some of the websites DoubleVerify labeled as containing "Adult Content" or "Copyright Infringement" material belonged to plaintiff FilmOn. FilmOn provides entertainment content on the web, including "hundreds of televisions channels, premium movie channels, pay-per-view channels and over 45,000 video-on-demand titles." (*FilmOn, supra*, 13 Cal.App.5th at p. 712.) FilmOn brought this lawsuit against DoubleVerify after DoubleVerify allegedly distributed confidential reports to its clients " 'falsely classify[ing] FilmOn Websites under the categories of "Copyright Infringement-File Sharing" and "Adult Content." ' " (*Ibid.*) FilmOn alleges that "as a direct result of [DoubleVerify's] false and disparaging statements published in the [] Reports," FilmOn incurred damages because "ad partners and potential ad partners have refused to advertise through websites in FilmOn's network." Claiming that its websites neither engage in copyright infringement nor feature adult content, FilmOn sued DoubleVerify for trade libel, tortious interference with contract, tortious interference with

prospective economic advantage, and violation of California's unfair competition law.

DoubleVerify responded by filing an anti-SLAPP motion. The trial court granted the motion, and the Court of Appeal affirmed. The Court of Appeal agreed with the trial judge that DoubleVerify's reports "concerned issues of interest to the public" because "the public ha[s] a demonstrable interest in knowing what content is available on the Internet, especially with respect to adult content and the illegal distribution of copyrighted materials." (*FilmOn*, *supra*, 13 Cal.App.5th at pp. 719, 714.) To support its conclusion, the court analogized DoubleVerify's confidential reports to ratings by the Motion Picture Association of America, writing, "the Motion Picture Association of America (MPAA) engages in conduct quite similar to DoubleVerify's activities by rating movies concerning their level of adult content, and the MPAA does so, because the public cares about the issue." (*Id*. at p. 720.)

As is relevant to our review, the court rejected the argument that DoubleVerify's reports, in fact, are different from MPAA's ratings. (*FilmOn*, *supra*, 13 Cal.App.5th at p. 720.) According to FilmOn, DoubleVerify's reports differ from the MPAA's film ratings because the latter are made widely available to the public, while DoubleVerify's reports are delivered to individual clients, and must be kept confidential. The court disagreed, stating its conclusion in absolute terms: "it is irrelevant that DoubleVerify made its reports confidentially to its subscribers," since "[n]either the identity of the speaker nor the identity of the audience affects the content of the communication, or whether that content concerns an issue of public interest." (*Id*. at p. 723.) So, "if an 'R' rating for adult content is a matter of 'public interest' when communicated by

5

the MPAA to the public at large, it remains a matter of public interest when communicated by DoubleVerify in confidential reports to its clients. Likewise, if FilmOn's alleged copyright infringement is an issue of public interest when reported by the press, it remains so when included in DoubleVerify's confidential reports." (*Ibid.*) In short, "[w]hether a statement concerns an issue of public interest depends on the content of the statement," and only that content, "not the statement's speaker or audience." (*Id.* at p. 722.)

We granted review to decide if and how the context of a statement — including the identity of the speaker, the audience, and the purpose of the speech — informs a court's determination of whether the statement was made "in furtherance of" free speech "in connection with" a public issue. (§ 425.16, subd. (e)(4).)

## II.

### A.

The anti-SLAPP law was enacted "to protect nonprofit corporations and common citizens 'from large corporate entities and trade associations' in petitioning government." (*USA Waste of California, Inc. v. City of Irwindale* (2010) 184 Cal.App.4th 53, 66.) Attempting to protect against "lawsuits brought primarily to chill" the exercise of speech and petition rights, the Legislature embedded context into the statutory preamble, "declar[ing] that it is in the public interest to encourage continued participation in matters of public significance." (§ 425.16, subd. (a).)

In the paradigmatic SLAPP suit, a well-funded developer limits free expression by imposing litigation costs on citizens who protest, write letters, and distribute flyers in opposition to

a local project. (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended June 23, 1997, pp. 2–3; Barker, *Common-Law and Statutory Solutions to the Problem of SLAPPs* (1993) 26 Loyola L.A. L.Rev. 395, 396.) Identifying the problem as one involving particular litigants, their motivations, and the effects of litigation, the Assembly Committee on Judiciary observed that approximately 25 percent of SLAPP suits "relate to development and zoning," while 20 percent "arise out of complaints against public officials and employees." (Assem. Com. on Judiciary, Analysis of Sen. Bill. No. 1296, *supra*, at p. 3.) The Committee recognized that "such lawsuits are often pernicious, masquerading as standard defamation and interference with prospective economic advantage litigation, while really brought by well-heeled parties who can afford to misuse the civil justice system to chill the exercise of free speech . . . by the threat of impoverishing the other party." (*Ibid.*) To curb what it took to be the "disturbing increase" in such lawsuits (§ 425.16, subd. (a)), the Legislature shifted burdens of proof and fees onto the lawsuit filer to "compensate[] the prevailing defendant for the undue burden of defending against litigation designed to chill the exercise of free speech and petition rights." (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 328.)

Consistent with the statute's purpose, its text defines conduct in furtherance of the rights of petition and free speech on a public issue not only by its content, but also by its location, its audience, and its timing. (See § 425.16, subd. (e)(1) ["before a legislative, executive, or judicial proceeding"]; § 425.16, subd. (e)(2) ["in connection with an issue under consideration or review by" a government entity]; § 425.16, subd. (e)(3) ["in a place open to the public or a public forum in connection with an

issue of public interest"].)  Indeed, we have previously noted that the Legislature " '*equated* a public issue with the authorized official proceeding to which it connects,' " effectively defining the protected status of the statement by the context in which it was made.  (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117, italics in original (*Briggs*).)

Admittedly, the catchall provision contains no similar contextual references to help courts discern the type of conduct and speech to protect.  (See § 425.16, subd. (e)(4) ["any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest"].)  But we interpret statutory language within its context, and in light of its structure, analogous provisions, and any other appropriate indicia of its purpose. (See *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385 [reading the statutory language in the context of its neighboring provisions]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["[T]he words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible."].)  Nothing in subdivision (e)(4) or other portions of the statute supports the conclusion that subdivision (e)(4) is the only subdivision where contextual information is excluded from consideration in discerning the type of conduct and speech worthy of procedural protection.

Indeed, that the language of the provision refers to "*other* conduct in furtherance" supports the inference that this provision encompasses conduct and speech similar to what is referenced in subdivision (e)(1) through (e)(3).  (§ 425.16, subd. (e)(4), italics added; see *International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342 [explaining that where a statute lists

a series of specific categories followed by a catchall category, the catchall is " ' "restricted to those things that are similar to those which are enumerated specifically" ' "].)

The reference to "any other conduct" in subdivision (e)(4) also underscores its role as the "catchall" provision meant to round out the statutory safeguards for constitutionally protected expression. (See, e.g., *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 164 [observing that subdivision (e)(4) "provides a catchall"].) In protecting "*any* other conduct" that meets the requirements laid out in its text (§ 425.16, subd. (e)(4), italics added), subdivision (e)(4) proves both broader in scope than the other subdivisions, and less firmly anchored to any particular context. (See *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 101 (*San Diegans*) [characterizing § 425.16, subdivision (e)(4) as "a 'catchall' that extends the anti-SLAPP statutes beyond actual instances of free speech to 'all conduct in furtherance of the exercise of the right of free speech in connection with a public issue' "]; *Collier v. Harris* (2015) 240 Cal.App.4th 41, 51 [same]; accord *Briggs*, *supra*, 19 Cal.4th at p. 1122 [stating that, in contrast to subdivision (e)(3) and (4), the first two subparts in subdivision (e) provide "a bright-line 'official proceeding' test"].) This provision consequently suggests that courts should engage in a relatively careful analysis of whether a particular statement falls within the ambit of "other conduct" encompassed by subdivision (e)(4).

It would be all but impossible, as part of such a careful analysis, to justify ignoring the ordinary contextual cues affecting how people generally evaluate speech. Our courts have not ignored such cues. (See *San Diegans*, *supra*, 13 Cal.App.5th

at p. 106 [the identity of the actor matters; "[Defendant] Inewsource is not a construction company. It is in the news reporting business, and the contracts [San Diegans for Open Government] challenges shape the way inewsource and KPBS gather, produce, and report the news"]; *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1653 (*Mendoza*) [the audience of the speech (in this case, an employer) matters; "We are also swayed by the public interest in safe workplaces, and in the liability which may attach to employers who fail to investigate prospective employees where prudence justifies such an investigation. Thus, as a foundational, broad-based proposition, we conclude that providing employment-screening reports is a constitutionally founded, protected activity within the meaning of the anti-SLAPP statute"]; *All One God Faith, Inc. v. Organic & Sustainable Industry Standards, Inc.* (2010) 183 Cal.App.4th 1186, 1204 (*All One*) [the purpose of the speech matters; "The purpose of the ' "OASIS Organic" seal' is to promote the sale of the *product* to which it is affixed, not the standard or its elements"].)

Nor are contextual considerations relevant merely to some generalized evaluation implicit in the analysis. In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity "was a person or entity in the public eye" or "could affect large numbers of people beyond the direct participants" (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 (*Wilbanks*)); and whether the activity "occur[red] in the context of an ongoing controversy, dispute or discussion" (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 (*Du Charme*)), or "affect[ed] a community

in a manner similar to that of a governmental entity" (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479).

The Court of Appeal's contrary position in this case is not supported by the cases on which it relied. Leaning on *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 (*Terry*) and *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450 (*Hecimovich*), the appellate court held that "[n]either the identity of the speaker nor the identity of the audience affects the content of the communication, or whether that content concerns an issue of public interest." (*FilmOn, supra*, 13 Cal.App.5th at p. 723.) But those two decisions stand only for the proposition that section 425.16 could apply "to private communications concerning issues of public interest." (*Terry, supra*, 131 Cal.App.4th at p. 1546; see also *Hecimovich, supra*, 203 Cal.App.4th at p. 465 [" ' " '[T]he focus of the speaker's conduct should be the public interest. . . .' " [Citation.] Nevertheless, it may encompass activity between private people.' "].) Long before *Terry* and *Hecimovich*, we held that section 425.16 may protect private events and conversations. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 91 ["When previously construing the statute, however, we have declined to hold 'that section 425.16 does not apply to events that transpire between private individuals' . . . ." quoting *Briggs, supra*, 19 Cal. 4th at p. 1116].) But we have never suggested quite a different proposition: that it will never matter whether the conversations were private or widely broadcasted and received, and for what purpose.

Indeed, those contextual factors mattered in both *Terry* and *Hecimovich*. In *Terry*, the court considered that the speakers were church leaders attempting to protect children in the church's youth groups, as evidenced by the fact that "the

matter was referred to the Davis Police Department for investigation." (*Terry*, *supra*, 131 Cal.App.4th at p. 1547; *id.* at p. 1548.) In *Hecimovich*, too, the court highlighted the relationship between the speech, the speaker, and the audience. (*Hecimovich*, *supra*, 203 Cal.App.4th at pp. 465–466 [emphasizing that "communications in issue here concern the well-being of young children in an afterschool sports program, as discussed between and among members of the PTO, parents of the young team members, and league officials"].) The court below erred in using these cases to constrain its inquiry to the content of DoubleVerify's speech, deracinated of context.

### B.

DoubleVerify concedes that section 425.16 invites courts to consider the context in which statements were made. But it argues that one kind of contextual cue — commercial context — is irrelevant except as specified in a neighboring provision, section 425.17, subdivision (c). We disagree.

Section 425.17, subdivision (c) categorically exempts certain expressive actions from the scope of section 425.16. To fall within the scope of the exemption, the speaker must be "a person primarily engaged in the business of selling or leasing goods or services" making "representations of fact about that person's or a business competitor's business operations, goods, or services" to "an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer" with "the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering

the person's goods or services."[3] (§ 425.17, subd. (c).) So whether section 425.17, subdivision (c) exempts the speech depends not only on the content of that speech but also the identity of the speaker, the intended audience, and the purpose of the statement.

---

[3] In its entirety, section 425.17, subdivision (c), states: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist:

(1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services.

(2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue."

Notice how the language of section 425.17, subdivision (c) and subsequent case law indicate that the provision exempts "only a subset of commercial speech" — specifically, comparative advertising.[4] (*All One, supra,* 183 Cal.App.4th at p. 1217; see *Simpson, supra,* 49 Cal.4th at pp. 32–33 [quoting *Mendoza, supra,* 182 Cal.App.4th at p. 1652, for the notion that " 'the Legislature appears to have enacted section 425.17, subdivision (c), for the purpose of exempting from the reach of the anti-SLAPP statute cases involving comparative advertising by businesses' "].) So certain commercially oriented statements will fall outside the scope of section 425.17, subdivision (c). (*All One, supra,* 183 Cal.App.4th at p. 1217 ["the better understanding of section 425.17, subdivision (c), is that all of the speech exempted from the anti-SLAPP statute is commercial speech, but not all commercial speech is exempted thereunder"].) Like all other statements that do not fall within the scope of an exemption, such statements are eligible for anti-SLAPP protection under section 425.16.[5]

---

[4]    The parties agree that DoubleVerify's reports to its clients are not exempted under section 425.17, subdivision (c), because DoubleVerify was not making representations about its own business but FilmOn's, and DoubleVerify and FilmOn were not competitors. (See *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 32 (*Simpson*) [finding that § 425.17, subd. (c) did not apply when " 'the representation was not "about" [defendant's] or a competitor's services or business operations' "]; *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 676 (*Stewart*) [same].)

[5]    We disapprove *Rezec v. Sony Pictures Entertainment, Inc.* (2004) 116 Cal.App.4th 135 to the extent it is inconsistent with this opinion.

DoubleVerify argues that considering commercial context under the catchall provision would "render[] [s]ection 425.17(c) redundant and mere surplusage," because it would involve importing the analysis for the exemption into the analysis for the catchall provision. But the Legislature's decision to explicitly require consideration of certain contextual factors — like speaker, audience, and purpose — in defining the comparative advertising exception should not lead us to decide these contextual factors are categorically excluded from consideration under section 425.16. When the statutory language and structure otherwise cut so sharply in favor of considering context in applying the anti-SLAPP statute, we should not lightly assume that context may be considered only under one subdivision merely because that subdivision explicitly mentions certain contextual factors.

Nor does it seem the Legislature contemplated that outcome when it added section 425.17, subdivision (c). Instead, the relevant legislative history included language observing how the exception allowed certain lobbying activities and marketing to "be viewed in the context of its offering, *just as a speech by a person against the building of a waste facility in the neighborhood.*" (Sen. Judiciary Com., Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, pp. 9–10, italics added.) It noted that while the latter "can clearly be seen to have been made in the context of exercising the person's constitutional right of speech," the "content and context of the former activities are clearly more in furtherance of business considerations." (*Id.* at p. 10.)

We do not, as FilmOn urges, sort statements categorically into commercial or noncommercial baskets in analyzing whether they are covered by the catchall provision. We merely conclude

that the very contextual cues revealing a statement to be "commercial" in nature — whether it was private or public, to whom it was said, and for what purpose — can bear on whether it was made in furtherance of free speech in connection with a public issue. (§ 425.16, subd. (e)(4).) In other words, context matters under the catchall provision, and commercial context is no exception.

## III.

### A.

So within the framework of section 425.16, subdivision (e)(4), a court must consider the context as well the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest. Having established this principle, we now turn to analyzing *how* context should feature in a court's analysis under the catchall provision, and to applying that framework to the facts of this case.

Our courts have ably distilled the characteristics of "a public issue or an issue of public interest." (§ 425.16, subd. (e)(4); see *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–924 (*Rivero*) [describing three non-exclusive categories of public interest]; *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 (*Weinberg*) [describing additional attributes of protected conduct].) But they have struggled — understandably — to articulate the requisite nexus between the challenged statements and the asserted issue of public interest — to give meaning, in other words, to the "in connection with" requirement. (§ 425.16, subd. (e)(4).)

Most often, courts strive to discern what the challenged speech is really "about" — a narrow, largely private dispute, for example, or the asserted issue of public interest. (See *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 85 [defendant's speech was "about falsified data and plagiarism in two scientific papers, not about global warming"]; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1572 [defendants' attempts to solicit competitor's agents and customers were not "about" the public issues of "workforce mobility and free competition" or "the pursuit of lawful employment"]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 [defendants' statements "were not about pollution or potential public health and safety issues in general, but about [the plaintiffs'] specific business practices"].) This focus on discerning a single topic of speech is less than satisfying; if the social media era has taught us anything, it is that speech is rarely "about" any single issue.

The inquiry under the catchall provision instead calls for a two-part analysis rooted in the statute's purpose and internal logic. First, we ask what "public issue or [] issue of public interest" the speech in question implicates — a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful.

The travails of the lower courts demonstrate that virtually always, defendants succeed in drawing a line — however tenuous — connecting their speech to an abstract issue of public interest. (See *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601 [defendants'

advertisements of a breast enlargement product were not "about the general topic of herbal supplements" but were instead "commercial speech about the specific properties and efficacy of a particular product"]; *Rivero, supra,* 105 Cal.App.4th at pp. 919, 924 [rejecting union's argument that, in publishing statements heralding suspension of a custodial supervisor, it was commenting on the abusive supervision of employees throughout a publicly financed educational institution].)

DoubleVerify is no exception. As it does now, DoubleVerify argued before the appellate court that its reports "concerned" or "addressed" topics of widespread public interest: the presence of adult content on the internet, generally, and the presence of copyright-infringing content on FilmOn's websites, specifically. To support its argument that FilmOn's alleged copyright infringement is a matter of public interest, DoubleVerify offered evidence that FilmOn has been subject to media reports and litigation over its streaming model.[6] The Court of Appeal agreed, finding that DoubleVerify's reports were made "in connection with" matters of public interest because the company's tags "identif[ied]" content that fell within categories of broad public interest. (*FilmOn, supra,* 13 Cal.App.5th at p. 720.)

But the catchall provision demands "some degree of closeness" between the challenged statements and the asserted public interest. (*Weinberg, supra,* 110 Cal.App.4th at p. 1132.)

---

[6] We grant DoubleVerify's requests for judicial notice of certain court orders and legislative history materials. (Evid. Code, §§ 451–452.) The court orders were entered in cases brought against FilmOn for copyright infringement, and the legislative history materials are of bills relating to the enactment of sections 425.16 and 425.17, subdivision (c).

So even if adult content on the Internet and FilmOn's particular streaming model are in fact issues of public interest, we agree with the court in *Wilbanks* that "it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898; see also *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 ["[t]he fact that 'a broad and amorphous public interest' can be connected to a specific dispute" is not enough].)

What it means to "contribute to the public debate" (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898) will perhaps differ based on the state of public discourse at a given time, and the topic of contention. But ultimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant — through public or private speech or conduct — participated in, or furthered, the discourse that makes an issue one of public interest. (See *All One*, *supra*, 183 Cal.App.4th at pp. 1203–1204 [finding the "OASIS Organic seal" did not "contribute to a broader debate on the meaning of the term 'organic' "]; *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 375 [finding the defendant's conduct "directly related" to an issue of public interest because it "served th[e] interests" of preventing child abuse and protecting children].)

Contrary to DoubleVerify's arguments, the *Wilbanks* rule adds no additional requirement beyond those already in the catchall provision. It is instead a reasonable interpretation of the provision's existing requirement that statements be made "in connection with" an issue of public interest — an

interpretation informed by the statutory purpose explicitly articulated in the preamble to the anti-SLAPP statute. Section 425.16, subdivision (a) "declares that it is in the public interest to encourage continued participation in matters of public significance." Though we have cautioned that statutory preambles do not impose substantive requirements (*Briggs*, *supra*, 19 Cal.4th at p. 1118), our task when interpreting legislation is to effectuate the statutory purpose — and "statements of purpose in a statute's preamble can be illuminating," particularly if a statute is ambiguous (*Yeager v. Blue Cross of California* (2009) 175 Cal.App.4th 1098, 1103).

We adopted the same approach in *Briggs*, where we construed subdivision (e)(1) and (e)(2) of the anti-SLAPP statute. (*Briggs*, *supra*, 19 Cal.4th at p. 1118.) We explained in *Briggs* that although the statutory preamble did not impose "an across-the-board 'issue of public interest' pleading requirement," we understood the Legislature to *equate* statements made in certain official proceedings with matters of "public significance." (*Ibid.* ["Any matter pending before an official proceeding possesses some measure of 'public significance' owing solely to the public nature of the proceeding . . . ."].) Likewise, here, the preamble's reference to "continued participation" in matters of public significance (§ 425.16, subd. (a)) adds no substantive requirement to a defendant's burden to show conduct "in furtherance of" free speech "in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)). The two are instead coextensive: a statement is made "in connection with" a public issue when it contributes to — that is, "participat[es]" in or furthers — some public conversation on the issue. But the inquiry of whether a statement contributes to the public debate is one a court can hardly undertake without

incorporating considerations of context — including audience, speaker, and purpose.

### B.

When it declined to consider the context in which DoubleVerify made its statements, the Court of Appeal overlooked critical details bearing on the court's scrutiny of the relationship between speech and the matter of public interest with which it is assertedly "in connection." (§ 425.16, subd. (e)(4).) We examine those contextual details now, working within the two-part framework we just described.

DoubleVerify has identified the public issues or issues of public interest to which its reports and their "tags" relate. It argues FilmOn is notorious for its long history of violating copyright laws, and "FilmOn's CEO and billionaire owner, Mr. David, regularly injects himself in the public spotlight to discuss himself, his companies, and the purported legality of FilmOn's services." The Court of Appeal, meanwhile, determined DoubleVerify's report "concerned an issue of public interest" because "the presence of adult content on the Internet generally, as well as copyright infringing content on FilmOn's websites specifically, has been the subject of numerous press reports, regulatory actions, and federal lawsuits." (*FilmOn, supra*, 13 Cal.App.5th at p. 720.) It also concluded DoubleVerify's reports were related to "the public debate over legislation to curb children's exposure to adult and sexually explicit media content." (*Ibid.*)

It is true enough that the various actions of a prominent CEO, or the issue of children's exposure to sexually explicit media content — in the abstract — seem to qualify as issues of public interest under subdivision (e)(4). But even assuming so,

the focus of our inquiry must be on "the specific nature of the speech," rather than on any "generalities that might be abstracted from it." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34, italics omitted.) Defendants cannot merely offer a "synecdoche theory" of public interest, defining their narrow dispute by its slight reference to the broader public issue. (*Ibid.*)

So the second part of the test moves from a focus on identifying the relevant matters of public interest to addressing the specific nature of defendants' speech and its relationship to the matters of public interest. We cannot answer this second question simply by looking at the content of the challenged statements — though no doubt in some cases that content will prove illuminating. In this case, that content comprises three columns listing various Internet domains and subdomains, "[t]otal [impressions]" from viewers, and the thematic "[c]ategories" to which each domain belongs, as defined by DoubleVerify. That DoubleVerify identifies FilmOn as falling within certain categories, however, tells us nothing of how that identification relates to the issues of copyright and adult content. We can answer that question only by looking at the broader context in which DoubleVerify issued its reports, discerning through that context whether the company's conduct qualifies for statutory protection by furthering the public conversation on an issue of public interest. (See § 425.16, subd. (a) [declaring it is "in the public interest to encourage continued participation in matters of public significance"]; *Wilbanks, supra,* 121 Cal.App.4th at p. 898 [explaining that conduct must "contribute to the public debate" to warrant protection under the catchall provision].)

It seems plain enough that DoubleVerify's reports did no such thing. DoubleVerify issues its reports not to the wider public — who may well be interested in whether FilmOn hosts content unsuitable for children or whether its streaming platform infringes copyright — but privately, to a coterie of paying clients. Those clients, in turn, use the information DoubleVerify provides for their business purposes alone. The information never entered the public sphere, and the parties never intended it to.

Yet no single element is dispositive — not DoubleVerify's for-profit status, or the confidentiality of the reports, or the use to which its clients put its reports. Nor does the combination of these contextual factors create a "commercial speech" category onto which we automatically map the presence or absence of anti-SLAPP protections. Some commercially oriented speech will, in fact, merit anti-SLAPP protection.

Consider, for example, *Industrial Waste & Debris Box Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1148 (*Industrial Waste*), in which the appellate court found that a for-profit consultant's report fell within the ambit of the catchall provision. "Commercial" though that report may have been, it analyzed public reports, landfill records, and state agency data to conclude a client's competitor — the plaintiff waste hauler — had overcalculated and misreported the rate at which it diverted waste for reuse, recycling, and composting. (*Id.* at p. 1143.) Following a rough approximation of the two-part framework we outline here, the court decided first that "limited landfill capacity and the environmental effects of waste disposal" are indeed issues of "significant interest" to the public and municipal governments; and second, that the report "shed light on these subjects" — that is, contributed to the issue of

public interest — by deriving data from public reports and commenting on "whether and to what degree waste hauling companies in Sonoma County were meeting government standards." (*Id.* at pp. 1148–1149.) These findings, in turn, prompted the sanitation board to alter its contracts and policies. (*Id.* at p. 1144.)

It is in the extent of its contribution to, or participation in, the public discussion that DoubleVerify's report diverges from the report at issue in *Industrial Waste*. As the court in that case aptly noted, "[w]hether speech has a commercial or promotional aspect is not dispositive" of whether it is made in connection with an issue of public interest. (*Id.* at p. 1150.) After all, the anti-SLAPP statute protects more than those activities " 'which meet the lofty standard of pertaining to the heart of self-government.' " (*Briggs, supra,* 19 Cal.4th at p. 1116, quoting *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1046–1047.) But nothing in the statute or our precedent elides the potential relevance of that commercial character in deciding whether speech merits protection under the catchall provision. Instead, a court must consider whether a statement — including the identity of its speaker, for example, or the audience sought — contributes to or furthers the public conversation on an issue of public interest. It is by carefully observing this wedding of content and context that we can discern if conduct is "in furtherance of" free speech "in connection with" a public issue or issue of public interest. (§ 425.16, subd. (e)(4).) What this union of content and context lets us discern in this case is that DoubleVerify's report does not qualify for protection under the catchall provision of the anti-SLAPP statute.

### IV.

The scenario before us involves two well-funded for-profit entities engaged in a private dispute over one's characterization — in a confidential report — of the other's business practices. Because our "primary goal is to determine and give effect to the underlying purpose of" the anti-SLAPP statute (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332), this context matters. It allows courts to liberally extend the protection of the anti-SLAPP statute where doing so would "encourage continued participation in matters of public significance," but withhold that protection otherwise. (§ 425.16, subd. (a).) And here, it allows us to discern what content alone conveys less clearly: DoubleVerify did not issue its report in furtherance of free speech "in connection with" an issue of public interest. (§ 425.16, subd. (e)(4).)

Because the Court of Appeal held to the contrary, we reverse.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** FilmOn.com v. DoubleVerify, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 13 Cal.App.5th 707
**Rehearing Granted**

_____

**Opinion No.** S244157
**Date Filed:** May 6, 2019

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Terry A. Green

_____

**Counsel:**

Baker Marquart, Ryan G. Baker, Scott M. Malzahn, Jaime W. Marquart, Christian A. Anstett and Blake D. McCay for Plaintiff and Appellant.

Fox Rothschild, Lincoln D. Bandlow, Margo J. Arnold and Rom Bar-Nissam for Defendant and Respondent.

Davis Wright Tremaine, Kelli L. Sager, Rochelle L. Wilcox and Thomas R. Burke for Motion Picture Association of America, Inc., The Hearst Corporation, Tegna Inc., California News Publishers Association and First Amendment Coalition as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ryan G. Baker
Baker Marquart
777 S. Figueroa Street, Suite 2850
Los Angeles, CA  90071
(424) 652-7800

Lincoln D. Bandlow
Fox Rothschild
10250 Constellation Boulevard, Suite 900
Los Angeles, CA  90067
(310) 598-4150

Rochelle L. Wilcox
Davis Wright Tremaine
865 S. Figueroa Street, Suite 2400
Los Angeles, CA  90017-2566
(213) 633-6800